**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| EVOLUTION STRATEGIES, LLC | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNLIMITED MARKETING ENTERPRISES | ) |
| INC., | ) |
|  | ) |
| Defendant. | ) |

Civil Action No. 1:19-cv-592 (AJT/TCB)

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on Evolution Strategies, LLC's ("Plaintiff")

Motion for Default Judgment against Unlimited Marketing Enterprises, Inc. ("Defendant") (Dkt.

11).[1] For the reasons articulated below, the undersigned U.S. Magistrate Judge recommends that

Plaintiff's Motion for Default Judgment be GRANTED.

### I. BACKGROUND

**A.    Procedural Posture**

On May 15, 2019, Plaintiff filed this lawsuit alleging causes of action for breach of

contract, actual fraud, and constructive fraud. (*See* Compl. ¶¶ 19-38.) After Defendant failed to

enter an appearance or respond in any fashion, the Court issued an Order on August 1, 2019,

ordering that Plaintiff obtain an entry of default from the clerk pursuant to Federal Rule of Civil

---

[1] The relevant filings before the undersigned include Plaintiff's Complaint (Dkt. 1) ("Compl.");
Plaintiff's Motion for Default Judgment (Dkt. 11) ("Mot. Default J."); Memorandum of Plaintiff
Evolution Strategies, LLC in Support of Motion for Default Judgment (Dkt. 11-1) ("Mem.
Supp."); Declaration of Ellis Hyman (Dkt. 11-2) ("Hyman Decl."); Declaration of Christina
Bustos (Dkt. 11-9) ("Bustos Decl."); and all attachments and exhibits submitted with those
filings.

Procedure 55(a). (Dkt. 8.) The Order further required Plaintiff to file a motion for default judgment and notice a hearing before the undersigned on Friday, August 30, 2019. (*Id.*) Plaintiff complied by requesting the clerk's entry of default on August 7, 2019 (Dkt. 9), and the clerk entered Defendant's default on August 19, 2019 (Dkt. 10). Plaintiff then filed the instant Motion for Default Judgment and noticed the hearing for Friday, August 30, 2019. (Dkts. 11-12.) Representatives for Defendant failed to appear or otherwise respond at the hearing, and the Court took this matter under advisement for the undersigned to issue this Report and Recommendation.

### B.  Jurisdiction and Venue

Before the Court can render default judgment, it must have subject-matter jurisdiction and personal jurisdiction over the defaulting party, and venue must be proper. First, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). A federal court has subject-matter jurisdiction when a dispute involves citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a)(1) (2018). Here, Plaintiff is a Virginia limited liability company whose sole member and president is a resident of Virginia. (Compl. ¶ 1; Hyman Decl. ¶ 2.) Defendant is a Florida corporation with its principal place of business in Sanford, Florida. (Compl. ¶ 2.) Accordingly, Plaintiff is a citizen of Virginia and Defendant is a citizen of Florida for purposes of diversity jurisdiction, and there is complete diversity between the parties. Furthermore, the amount in controversy exceeds $75,000 because Plaintiff, in its Complaint, sought over one million dollars in monetary relief, exclusive of interest, attorneys' fees, and costs. (*See* Compl. at 8.) Now, at the default judgment stage, Plaintiff seeks $949,883.00 in money damages, exclusive of interest, attorneys' fees, and costs. (*See* Mem. Supp. at 13-14.)

Second, the Court has personal jurisdiction over Defendant. The standards of federal due

2

process and the forum state's long-arm statute must be satisfied for a federal court to have personal jurisdiction over a party. *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012). Federal due process permits personal jurisdiction where a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Virginia's long-arm statute, Virginia Code section 8.01-328.1, provides for personal jurisdiction to the extent that federal due process permits. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002). With federal due process and Virginia's long-arm statute requiring the same standard, essentially only one inquiry is required. *See id.* Furthermore, the inquiry requires the Court to either have specific jurisdiction, which is achieved when the defendant's contacts with the state give rise to the basis of the lawsuit, or general jurisdiction, which requires that the defendant have "continuous and systematic" activities in the forum state. *Tire Eng'g & Distribution*, 682 F.3d at 301 (internal citation omitted).

Two bases under Virginia's long-arm statute provide for specific personal jurisdiction over Defendant in this case. Virginia has personal jurisdiction over a party (1) "[t]ransacting any business" or (2) "[c]ontracting to supply services or things" in Virginia. Va. Code Ann. § 8.01-328.1(A)(1)-(2) (2019). Here, Defendant contracted to supply services to Plaintiff, a Virginia limited liability company. (*See* Compl. ¶ 1; Hyman Decl., Ex. A.) Therefore, Defendant (1) transacted business and (2) contracted to supply services in Virginia, satisfying the Commonwealth's long-arm statute.

Furthermore, federal courts have personal jurisdiction over a party that contractually consented to it or waived it pursuant to a valid forum selection clause. *See W.L. Gore & Assocs.,*

3

*Inc. v. Medtronic, Inc.*, 778 F. Supp. 2d 667, 671 (E.D. Va. 2011). Here, Defendant consented to the exclusive jurisdiction of Virginia courts to adjudicate a dispute about the contract. (Hyman Decl., Ex. A § 18, at 6.) Section 18 of the parties' contract provides that "suit to enforce any provision of this Agreement may be brought in a court of competent jurisdiction within the Commonwealth of Virginia, and for this purpose the Parties hereby expressly and irrevocably consent[] to the jurisdiction of said court." (*Id.*) Because Virginia's long-arm statute is satisfied, and Defendant consented to Virginia's jurisdiction, the undersigned finds that the Court has personal jurisdiction over Defendant.

Lastly, Plaintiff filed this lawsuit in the proper venue. Venue is proper in a federal judicial district in which a substantial part of the events or omissions giving rise to the action occurred. 28 U.S.C. § 1391(b)(2) (2018). Here, venue is proper for many of the same reasons why personal jurisdiction over Defendant is proper.  Defendant transacted business with a company incorporated under Virginia law and located in Alexandria, Virginia, which is within the Eastern District of Virginia. (Compl. ¶¶ 1, 5.) As such, Defendant's work (or lack thereof) pursuant to the parties' contract constitutes a substantial part of the events or omissions giving rise to this litigation. Accordingly, the undersigned finds that venue is proper.

### C.     Service of Process

Before the Court can render default judgment, it must be satisfied that the defaulting party has been properly served. Under Federal Rule of Civil Procedure 4(h)(1) and (e)(1), a plaintiff can serve a corporation pursuant to the state's law in which the federal district court is located. *See* Fed. R. Civ. P. 4(e)(1), (h)(1).  Under Virginia Code sections 8.01-329(A) and (B), a plaintiff can serve a nonresident corporation via the Secretary of the Commonwealth by filing an affidavit stating that the corporation to be served is a nonresident and setting forth the

4

corporation's last-known address. *See* Va. Code Ann. § 8.01-329(A)-(B) (2019). The Secretary is then charged with the duty to send service of process by certified mail to the defendant's last-known address, including the notice of service, a copy of the process or notice, and a copy of the affidavit. *Id.* § 8.01-329(C). Service is deemed effective on the date the plaintiff served the Secretary. *Id.*

On May 23, 2019, Plaintiff's counsel submitted to the Secretary of the Commonwealth of Virginia an Affidavit for Service of Process on the Secretary of the Commonwealth, along with the summons, complaint, and attachments, denoting that Defendant was a nonresident foreign corporation. (Bustos Decl. ¶ 8; Dkt. 7.) Pursuant to Virginia Code section 8.01-329(C)(3), the Secretary completed a Certificate of Compliance, certifying that on June 5, 2019, the Secretary forwarded the affidavit, summons, and complaint to Defendant by certified mail, return receipt requested. (Bustos Decl. ¶ 9; Dkt. 7.) Plaintiff then filed a copy of the affidavit and the Secretary's Certificate of Compliance with the Court. (Bustos Decl. ¶ 10; Dkt. 7.) Accordingly, the undersigned finds that Defendant received proper service of process.[2]

## II. FINDINGS OF FACT

Upon a full review of the pleadings and record in this case, the undersigned finds that Plaintiff has established the following facts.

---

[2] While not dispositive in terms of service, it is worth noting that Defendant's counsel confirmed via email to Plaintiff's counsel that he received a copy of the Complaint, establishing that he was aware of this lawsuit. (Bustos Decl. ¶¶ 11, 13, Exs. A-B.) On June 26, 2019, Defendant's counsel requested an additional thirty (30) days to respond, and Plaintiff's counsel consented. (*Id.* ¶ 11, Ex. A.) Defendant's counsel emailed Plaintiff's counsel again on August 9, 2019, requesting additional time to respond. (*Id.* ¶ 13, Ex. B.) Plaintiff's counsel responded, reminding Defendant's counsel about the Court's Order issued on August 1, 2019, requiring Plaintiff to request entry of default from the clerk and promptly file a motion for default judgment. (*Id.*; *see* Dkt. 8.) Plaintiff's counsel then emailed Defendant's counsel a copy of the default on August 19, 2019. (*Id.* ¶ 15, Ex. C.)

Plaintiff if a limited liability company located in Alexandria, Virginia and organized under Virginia law. (Compl. ¶ 1; Hyman Decl. ¶ 2.) Ellis Hyman is Plaintiff's sole member and president, and he is resident of Virginia. (Compl. ¶ 1; Hyman Decl. ¶ 2.) Plaintiff's services include placing mass telephone calls on behalf of political campaigns, political party committees, and nonprofit organizations. (Compl. ¶ 1.) Defendant is a Florida corporation that provides equipment and personnel needed to place mass call campaigns. (*Id.* ¶ 2.) On September 5, 2016, Plaintiff and Defendant entered into a contract providing that Defendant would place mass outgoing calls as a subvendor for Plaintiff in consideration of a fee. (*Id.* ¶¶ 5-6; Hyman Decl. ¶ 3, Ex. A.)[3]

On September 10, 2018, Plaintiff submitted a work order to Defendant, and Defendant accepted it. (Compl. ¶ 8; Hyman Decl. ¶ 5.) The work order required Defendant to place 392,911 calls as part of a campaign for Plaintiff's client, the Democratic Congressional Campaign Committee ("DCCC"), to poll potential voters and gather information. (Compl. ¶ 8; Hyman Decl. ¶ 5.) Defendant was supposed to record (1) when an operator successfully reached a call recipient and (2) the recipient's answers to questions regarding her voting preferences. (Compl. ¶ 8; Mem. Supp. at 3.)

On approximately September 14, 2018, Defendant told Plaintiff that they had successfully completed the calls for the work order. (Compl. ¶ 10; Hyman Decl. ¶ 9.) Plaintiff did not perceive any problems with the data set and submitted the results to the DCCC. (Compl. ¶ 10; Hyman Decl. ¶ 9.) However, the DCCC later discovered that many of the calls were either never completed or coded incorrectly, and informed Plaintiff of the problem on September 18,

---

[3] The contract, attached as Exhibit A to Hyman's Declaration (Dkt. 11-3), states that it became effective on September 5, 2016. Hyman's Declaration (Dkt. 11-2), on the other hand, states that the parties entered into the contract on September 5, 2018. The undersigned is basing this finding of fact on the contract.

2018. (Compl. ¶ 11; Hyman Decl. ¶ 10.) Specifically, Defendant had coded calls as "completed" when they had in fact been disconnected or otherwise incapable of completion. (Compl. ¶ 11; Hyman Decl. ¶ 10.) This rendered the data set invalid. (Compl. ¶ 11; Hyman Decl. ¶ 10.) When Plaintiff notified Defendant about the problem, one of Defendant's officials, Diane Chrzanowski, emailed Hyman on September 21, 2018, and admitted that one of the managers turned off the "Call Progress Analysis computer program" in one of the calling rooms for four (4) days. (Compl. ¶¶ 13-14; Hyman Decl. ¶ 13, Ex. C.) In other words, the seventy-four (74) call operators in that room could record calls as complete when they were in fact not. (Compl. ¶ 14; Hyman Decl. ¶ 13.) Chrzanowski emailed Hyman again the next day, explaining the company's failure in the work order and outlining new policies in place to avoid future problems. (Compl. ¶ 15; Hyman Decl. ¶ 14, Ex. D.) On October 1, 2018, Brent Kawiuk, another one of Defendant's senior officials, emailed Hyman and again admitted that Defendant had failed to properly record the calls for the DCCC. (Hyman Decl. ¶ 15, Ex. E.) Attached to Kawiuk's email was a checklist outlining Defendant's problems, including its failure to hold the managers accountable, track call statistics properly, and ensure accurate live-operator dispositions. (*Id.*)

Plaintiff suffered several financial and reputational consequences because of Defendant's conduct. First, the DCCC did not pay Plaintiff, and Plaintiff did not pay Defendant for the work order. (Compl. ¶ 12; *see* Mem. Supp. at 4.) On this work order alone, Plaintiff stood to earn a profit of $0.1412 per completed call and twelve (12) "set-up fees" of $200.00 per congressional district, totaling $57,879.03.[4] (Hyman Decl. ¶ 6; Mem. Supp. at 3.) Second, Plaintiff lost future business from the DCCC for the remainder of the 2018 general election campaign cycle. (Compl.

---

[4] The undersigned's calculation and Plaintiff's calculation differ slightly. Plaintiff claims that it lost $57,883.00 in profit under the work order. However, multiplying .1412 (the profit per call) by 392,911 (the number of calls) equals $55,479.03. Adding $2,400 (the set-up fees) to $55,479.03 equals $57,879.03.

¶ 16; Hyman Decl. ¶ 7.) Prior to the work order at issue, DCCC senior officials told Hyman that if Plaintiff performed satisfactorily on the work order, it could expect to be given more calling work for additional congressional races. (Compl. ¶ 9; Hyman Decl. ¶ 7.) Specifically, the DCCC told Hyman to expect work for between twenty-five (25) and forty (40) congressional races, with an average of three (3) anticipated rounds of calling per race and approximately 25,000 calls per round. (Compl. ¶ 9; Hyman Decl. ¶ 7.) Assuming the DCCC had hired Plaintiff for thirty-two (32) of those races (the median between twenty-five (25) and forty (40)), Plaintiff would have earned a profit of \$336,000.00[5] in calling fees and \$6,400.00[6] in "set-up fees," equaling \$342,400.00 in profit from the DCCC alone.[7] (Hyman Decl. ¶ 8.)

Third, Plaintiff had to hire a different, more expensive company to complete the work they contracted for with Defendant for other clients. (Compl. ¶ 17.) For one client, Plaintiff incurred additional costs of \$50,000 for the same work that Defendant would have performed. (Compl. ¶ 17; Hyman Decl. ¶ 17, Ex. E.) Fourth, Plaintiff believes it has suffered substantial reputational harm due to the outcome of the work order for the DCCC. (*See* Compl. ¶ 18; Hyman Decl. ¶ 18.) Hyman estimates that other campaigns or potential clients learned of the mishap with the DCCC and hired other companies to complete work that they would have otherwise hired Plaintiff for. (Compl. ¶ 18; Hyman Decl. ¶ 18.) Hyman estimates that this has cost his company approximately \$500,000 in lost profits. (Hyman Decl. ¶ 18.)

Lastly, the parties' contract provides for the prevailing party to recover payment for attorneys' fees and costs in a dispute about the contract. (Hyman Decl., Ex. A § 19, at 6.) Section 19 mandates that in the case of any legal action between the parties, "the prevailing party will be

---

[5] This sum is figured by multiplying \$0.14 by 75,000 by 32.
[6] This sum is figured by multiplying \$200.00 by 32.
[7] Notably, Plaintiff's filings figure this sum by approximating only \$0.14 of profit per call, not \$0.1412 cents per call. (*See* Compl. ¶9; Hyman Decl. ¶ 8.)

entitled to recover expenses, including reasonable attorneys['] fees and expenses." (*Id.*) Plaintiff has incurred $5,627.00 in attorneys' fees and $475.00 in related costs in prosecuting the litigation. (Bustos Decl. ¶ 16.)

### III. EVALUATION OF THE PLAINTIFF'S COMPLAINT

When a defendant has defaulted, the well-pleaded allegations of facts set forth in the plaintiff's complaint are deemed admitted. *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)). However, the defaulting party is not deemed to admit conclusions of law or "allegations regarding liability that are not well-pleaded." *Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 540 (D. Md. 2011) (internal quotation marks and citations omitted)). Consequently, before entering default judgment, the Court must evaluate the plaintiff's complaint against the standards of Federal Rule of Civil Procedure 12(b)(6) to ensure that the complaint properly states a claim upon which relief can be granted. *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).

Plaintiff alleged three separate counts in its complaint: (1) breach of contract, (2) actual fraud, and (3) constructive fraud. (*See* Compl. ¶¶ 19-38.) Plaintiff now seeks default judgment as to only the breach of contract claim and the constructive fraud claim. Accordingly, the undersigned will consider only the counts Plaintiff seeks default judgment for.

### A.    **Breach of Contract (Count 1)**

The parties' contract is governed by Virginia law. (Hyman Decl., Ex. A § 18, at 6.) Under Virginia law, the plaintiff must show three elements to successfully bring an action for breach of contract: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation;" and (3) "injury or damage to the plaintiff caused by the

breach of obligation." *Squire v. Va. Hous. Dev. Auth.*, 758 S.E.2d 55, 60 (Va. 2014) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

Plaintiff sufficiently alleges a breach of contract claim. First, Plaintiff demonstrates that a contract existed between the parties. (*See generally* Hyman Decl., Ex. A.) The contract provided for Plaintiff to give Defendant projects via separate work orders. (*Id.* § 1, at 2.) Plaintiff issued a work order on September 10, 2018, and Defendant accepted that work order. (*Id.* ¶ 5, Ex. B.) Defendant was to place 392,911 calls on behalf of Plaintiff's client, the DCCC. (*Id.* ¶ 5.) On approximately September 14, 2018, Defendant notified Plaintiff that the calls were complete, and Plaintiff submitted the results to the DCCC. (*Id.* ¶ 9.)

Second, Plaintiff demonstrates that Defendant breached the contract. When Plaintiff submitted Defendant's data set, the DCCC discovered that many calls were either incomplete or coded incorrectly. (*Id.* ¶ 10.) This rendered the entire data set invalid. (*Id.*) Hyman notified Defendant of the problem on September 20, 2018. (*Id.* ¶ 12.) Defendant then admitted that some call data were recorded incorrectly. (*See id.* ¶ 13, Ex. C.) On September 21, 2018, Defendant's official verified to Hyman, via email, that one of their managers had turned off the data collection program in one of the call rooms. (*Id.*) This allowed seventy-four (74) employees in that room, over the course of four (4) days, to incorrectly code calls as complete when they were not. (*Id.*) The following day, Defendant's official emailed Hyman again, including an outline of the problems contributing to their failure on the work order and policies they would implement to address them. (*Id.* ¶ 14, Ex. D.) And finally, a second official from Defendant emailed Hyman a checklist of the problems that occurred during the work order, including, among other things, an admission that it had failed to properly record the status of the DCCC calls. (*Id.* ¶ 15, Ex. E.)

Third, as outlined in detail above, Plaintiff shows that it incurred financial loss in

multiple ways due to Defendant's breach. Plaintiff lost (1) $57,879.03 in anticipated profit under the work order because the DCCC did not pay Plaintiff; (2) $342,000.00 in future profit from anticipated business from the DCCC; (3) $50,000 due to hiring a more expensive vendor to complete the work Plaintiff contracted for with Defendant; and (4) $500,000.00 in lost profits due the reputational harm caused by the problematic work order in this case. (*Id.* ¶¶ 7-8, 11, 17-18.) These losses total $949,879.03. (*See id.*) Accordingly, Plaintiff has adequately plead a breach of contract claim under Virginia law, pursuant to Federal Rule of Civil Procedure 12(b)(6).

### B.     Constructive Fraud (Count 3)

Under Virginia law, the elements for constructive fraud are (1) "a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently," and (2) "the injured party was damaged as a result of his reliance upon the misrepresentation." *Baker v. Elam*, 883 F. Supp. 2d 576, 580 (E.D. Va. 2012) (internal citations omitted). The undersigned finds that Plaintiff sufficiently pleads a claim for constructive fraud. First, as established above, Defendant breached the contract by submitting false information to Plaintiff regarding the completion of the call campaign. (*See, e.g.*, Hyman Decl. ¶¶ 10, 13.) Defendant submitted call data to Plaintiff with no indication that a number of the calls were incomplete or coded incorrectly. (*See id.* ¶ 9.) In fact, one of Defendant's managers had turned off the Call Progress Analysis program in one of the call rooms for four (4) days, resulting in incomplete phone calls being recorded as complete. (*Id.* ¶ 13, Ex. C.) Defendant's officials unequivocally admit this to be the case. (*Id.* ¶¶ 13-15, Ex. C.)

Second, Plaintiff relied on Defendant's submission. Presumably, had Plaintiff realized that the data set was invalid, it would never have submitted the data to their client—especially a

11

client that promised lucrative future business. (*See, e.g., id.* ¶¶ 7-8.) Yet, Plaintiff alleges that it did not discern any problems with the data set and submitted it to the DCCC. (Compl. ¶¶ 10-11.) Hence, Plaintiff relied on Defendant's misrepresentation. Further, Plaintiff has shown that it was harmed by relying on Plaintiff's representation. Plaintiff lost the anticipated profit from the work order, damaged its business relationship with a client, lost anticipated profit from future projects, and had to hire a more expensive vendor to complete the work it had contracted for. (See Hyman Decl. ¶¶ 7-8, 11, 17-18.) In sum, Plaintiff demonstrates that Defendant made a false representation when it submitted the data from the work order, that Plaintiff relied on it, and that it suffered damages as a result.

IV. R<small>EQUESTED</small> R<small>ELIEF</small>

A.   **Money Damages**

In terms of money damages, Plaintiff seeks an award of $949,883.00. Based on the affidavit from Ellis Hyman, the undersigned finds it appropriate to award Plaintiff $949,879.03 for the damages it incurred due to Defendant's breach of contract.

In contract actions, plaintiffs are entitled to be put in as good of a position as they would have been had the contract been performed. *See, e.g., Nichols Const. Corp. v. Va. Machine Tool Co.,* 661 S.E.2d 467, 471 (Va. 2008). It follows that a plaintiff is only entitled to the actual loss sustained. *Dominion Resources, Inc. v. Alstom Power, Inc.,* 825 S.E.2d 752, 756 (Va. 2019). Accordingly, a plaintiff is not "allowed to be put in a better position than he would have been had the wrong not been done and the contract not been broken." *Orebaugh v. Antonious,* 58 S.E.2d 873, 875 (Va. 1950).

In this case, putting Plaintiff in the position it would have been had the contract been performed includes the following four components, outlined in detail above in the undersigned's

12

findings of fact:

- (1) Plaintiff would have received $57,879.03 in profit from the work order. (*See* Hyman Decl. ¶ 6.) Plaintiff would have made $0.1412 in profit per call, multiplied by 392,911 calls, totaling $55,479.03. (*See id.*) In addition, Plaintiff would have received "set-up fees" of $200.00 for twelve (12) congressional districts, equaling $2,400.00.

- (2) Plaintiff lost anticipated future business and profits of $342,000.00 from the DCCC during the 2018 election cycle. (Compl. ¶ 16; Hyman Decl. ¶ 7-8, 16.) The DCCC told Plaintiff that it would give more calling work for additional congressional races, leading to profit of approximately $336,000.00 in calling fees and $6,400 in "set-up fees." (Hyman Decl. ¶¶ 7-8.)

- (3) Plaintiff had to hire a different company to complete the contract after Defendant's breach. (*See id.* ¶ 17, Ex. F.) For one client, Plaintiff incurred additional costs of $50,000. (*Id.*)

- (4) Plaintiff suffered an estimated $500,000 loss in future profit due to reputational harm that resulted from Defendant's breach of contract. (*See* Compl. ¶ 18; Hyman Decl. ¶ 18.)

Together, these total $949,879.03 in money damages.

### B.    Attorney's Fees and Costs

Parties may contract away the "American rule" for attorneys' fees and instead "adopt[] provisions shifting fees to the losing party in disputes involving the contract." *Dewberry & Davis, Inc. v. C3NS, Inc.* 723 S.E.2d 239, 243 (Va. 2012). Here, the parties' contract contained a fee-shifting provision providing that the prevailing party is entitled to the payment of attorneys'

fees and costs in a dispute. (Hyman Decl., Ex. A § 19, at 6) ("In any action between the Parties to enforce any of the terms of this Agreement the prevailing party will be entitled to recover expenses, including reasonable attorney fees and expenses and fees of any appeal(s).")

Plaintiff requests $6,102.00 in attorneys' fees and costs. (Mem. Supp. at 14.) Specifically, Plaintiff has incurred $5,627.00 in attorneys' fees and $475.00 in costs. (Bustos Decl. ¶ 16.) The undersigned has reviewed the Plaintiff's fees and costs and finds that they are reasonable compensation for the time expended to enforce Plaintiff's rights. Therefore, Plaintiff should be awarded $6,102.00 in attorneys' fees and costs.

## V. RECOMMENDATION

For the reasons stated above, the undersigned recommends default judgment against Defendant. Specifically, the undersigned U.S. Magistrate Judge recommends Plaintiff be awarded $955,981.03 in total, consisting of $949,879.03 in monetary damages and $6,102.00 in attorney's fees and costs.

## VI. NOTICE

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service. Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

September 27, 2019
Alexandria, Virginia

15